**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>JACK MILLER, et al.,<br><br>Plaintiff-Intervenors,<br><br>POTOMAC RIVERKEEPER, INC.,<br><br>Plaintiff-Intervenor,<br><br>and<br><br>WASHINGTON SUBURBAN SANITARY COMMISSION,<br><br>Proposed Plaintiff-Intervenor,<br>v.<br><br>DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY, et al.,<br><br>Defendants. | Civil Action No. 26-cv-1346 |

**WASHINGTON SUBURBAN SANITARY COMMISSION'S**
**COMPLAINT IN INTERVENTION**

Plaintiff-Intervenor Washington Suburban Sanitary Commission ("WSSC Water") files its Complaint in Intervention against Defendants District of Columbia Water and Sewer Authority ("DC Water") and the District of Columbia (together, "Defendants"), respectfully showing this Court as follows:

## INTRODUCTION

1. This action arises from the collapse of the Potomac Interceptor ("PI") on January 19, 2026, resulting in one of the largest sewage spills in the modern history of the Potomac River.

2. The PI is a 54-mile sewer line built in the 1960s that carries an average of 60 million gallons of sewage per day from Maryland, Virginia, and the District of Columbia to the Blue Plains Advanced Wastewater Treatment Plant ("Blue Plains") for treatment and discharge. At all relevant times, DC Water was and is responsible for maintaining, operating, inspecting, and repairing the PI.

3. In 2012, DC Water, WSSC Water, and three other regional jurisdictions entered into the Blue Plains Intermunicipal Agreement of 2012 (the "IMA"), which governs, among other things, the allocation of wastewater treatment capacity at Blue Plains and associated facilities, the allocation of capital and operating and maintenance costs for shared facilities, and DC Water's responsibilities as NPDES discharge permit holder for Blue Plains.

4. WSSC Water is among the largest water and wastewater utilities in the United States, and the PI is one of WSSC Water's primary wastewater conveyance routes to Blue Plains, with approximately 18 million gallons of its wastewater flowing through it every day. WSSC Water's sewer collection and transmission system connects to DC Water's at more than six points of interconnection, including to the PI, and WSSC Water depends on DC Water to maintain the PI.

5. DC Water knew the collapsed segment of the PI was corroded and at risk of failing for more than a decade. Its own inspections between 2011 and 2015 documented widespread corrosion throughout the PI, including the relevant segment. In December 2015, in its Capital Improvement Program, DC Water formally identified a capital improvement project designated to rehabilitate PI segments with structural defects, including the segment that ultimately collapsed and the segments upstream and downstream from it (that project is referred to as "LZ").

6. Upon information and belief, by 2024, DC Water's own data showed the pipe wall had corroded to less than 1.3 inches thick, with visible holes and sections of pipe missing entirely; and in December 2024, DC Water's own documents stated that the PI needed immediate repair to prevent collapse. Yet, in February 2025, less than a year before the PI's collapse, DC Water cancelled the very procurement designed to rehabilitate it.

7. After decades of use and years of neglect, on January 19, 2026, a 72-inch diameter section of the PI collapsed in Montgomery County, Maryland, at the Chesapeake and Ohio Canal National Historical Park near Clara Barton Parkway just east of the I-495 interchange, discharging a flood of untreated sewage to the ground surface and into waters of the United States, including the Potomac River and its tributaries.

8. The overflow continued for days, and DC Water publicly reported the collapse, release, and an estimate of the volume of wastewater discharged to the Potomac River and its tributaries.

9. The collapse caused immediate and continuing harm to the Potomac River, its tributaries, and surrounding lands. Public health authorities issued advisories warning residents to avoid direct contact with affected areas and portions of the Potomac River.

10. DC Water failed to implement any reasonable interim measures to manage the risk of collapse while rehabilitation was pending, and as a result, failed to contain the sewage spill or minimize its impact.

11. Upon information and belief, to date, the PI's remediation is still not complete.

12. DC Water has also identified at least two additional PI segments in condition equal to or worse than the segment that collapsed, including a 1,750-linear-foot segment near the

confluence of Muddy Branch and the Potomac River, in close proximity to WSSC Water's drinking water intake serving more than one million customers daily.

13. WSSC Water brings this Complaint against DC Water and the District of Columbia as a matter of right under Clean Water Act section 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B), for injunctive relief for violations of (1) section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for unauthorized discharges of sewage; (2) DC Water's failure to properly operate, inspect, and maintain the PI as required by its permit; and (3) DC Water's failure to take all reasonable steps to minimize or correct the adverse impact on the environment resulting from its noncompliance with the NPDES permit.

## PARTIES

14. Plaintiff-Intervenor Washington Suburban Sanitary Commission is a bi-county agency of the State of Maryland, organized and existing under the laws of the State of Maryland as set forth in the Maryland Annotated Code at Division II of the Public Utilities Article, §§ 16-101, et seq., which provides water and sewer services to properties located in the Washington Suburban Sanitary District. WSSC Water is among the largest water and wastewater utilities in the United States, serving nearly two million customers in Montgomery and Prince George's Counties, Maryland, and has a principal place of business at 14501 Sweitzer Lane, Laurel, Maryland 20707. WSSC Water is a "citizen" within the meaning of 33 U.S.C. § 1365(g).

15. The Government Plaintiff is the United States of America, by authority of the Attorney General of the United States, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA").

16. Plaintiff-Intervenor Potomac Riverkeeper, Inc. ("PRKN"), is a public interest, not-for-profit corporation organized and existing under the laws of the State of Maryland and headquartered in Washington, D.C.

17. Plaintiff-Intervenors Jack Miller, KJ's Outdoor Adventures, LLC, Prince William Marina, Inc., Arian Hosseini, Dr. Nicholas Lailas, M.D., and L.J.K. Outdoors, LLC are individuals and entities residing or doing business in Maryland or Virginia.

18. Defendant District of Columbia Water and Sewer Authority is an independent authority of the District of Columbia government, established pursuant to D.C. Law 11-111, codified at D.C. Code § 34-2202.02. DC Water is a corporate body with separate legal existence from the District of Columbia, with the power to sue and be sued in its own name. DC Water owns and operates both the PI and Blue Plains and holds NPDES Permit No. DC0021199 issued by the U.S. Environmental Protection Agency ("EPA") pursuant to 33 U.S.C. § 1342, which the EPA has administratively extended under 40 C.F.R. § 122.6. DC Water distributes drinking water and collects and treats sewage and stormwater from customers in the District of Columbia and provides wastewater collection and treatment services for surrounding counties in Virginia and Maryland.

19. DC Water is a "municipality" as defined in 33 U.S.C. § 1362(4) and a "person" as defined in 33 U.S.C. § 1362(5).

20. Defendant District of Columbia is a "State" as defined in 33 U.S.C. § 1362(3) and is named as a Defendant in this action pursuant to Section 309(e) of the Clean Water Act, 33 U.S.C. § 1319(e), which requires that the State be joined as a party to any civil action brought against a municipality under Section 309 of the Clean Water Act.

## JURISDICTION AND VENUE

21. On April 20, 2026, the United States ("Government Plaintiff") brought a civil action against DC Water and the District of Columbia alleging violations of the Clean Water Act. U.S. Compl., Dkt. No. 1.

22. Plaintiff-Intervenor WSSC Water brings this Complaint pursuant to 33 U.S.C. § 1365(b)(1)(B), which provides WSSC Water a right of intervention when the EPA has commenced and is diligently prosecuting an enforcement action under the Clean Water Act for claims that could otherwise be brought under 33 U.S.C. § 1365(a)(1).

23. This Court has jurisdiction over the subject matter of this action. 33 U.S.C. § 1319(b); 28 U.S.C. §§ 1331, 1345, and 1355(a).

24. This Court has jurisdiction over WSSC Water's claims pursuant to 33 U.S.C. § 1365(b)(1)(B).

25. Venue is proper in this District pursuant to section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because both DC Water and the District of Columbia are located and doing business in this District and because the United States' underlying enforcement action is pending in this District.

## LEGAL FRAMEWORK

### Clean Water Act

26. Congress enacted the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

27. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant to navigable waters, except as authorized by a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402 of the Act, 33 U.S.C. § 1342, or other enumerated sections of the Act not relevant here.

28. The Act defines "pollutant" to include sewage, garbage, sewage sludge, and industrial, municipal, and agricultural waste discharged into water. 33 U.S.C. § 1362(6). The Act further designates certain toxic pollutants under Section 307(a), 33 U.S.C. § 1317(a), including lead, mercury, cadmium, nickel, and polychlorinated biphenyls (PCBs), as listed in 40 C.F.R. § 401.15.

29. The Act defines "point source" to mean "any discernible, confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

30. The Act defines "navigable waters" as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

31. The regulations implementing the Act define "waters of the United States" to include, *inter alia*, waters "which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce" (often referred to as "traditional navigable waters") and tributaries to such waters that are relatively permanent, standing or continuously flowing. 40 C.F.R. § 120.2(a).

**NPDES Program**

32. Section 402(a) of the Act created the National Pollutant Discharge Elimination System, commonly known as NPDES. Pursuant to this section, the EPA may issue permits that authorize the discharge of any pollutant to waters of the United States, but only in compliance with the conditions and limitations set forth in such permits. 33 U.S.C. § 1342(a).

33. EPA administers the NPDES program in the District of Columbia.

34. Section 402(a)(2) of the Act directs EPA to prescribe conditions for NPDES permits to ensure compliance with the Act. 33 U.S.C. § 1342(a)(2).

**Enforcement Provisions**

35. The Clean Water Act authorizes the United States to commence a civil action for appropriate relief, including injunctive relief and civil penalties, against any person who has violated any requirement or prohibition of the Act or regulations promulgated thereunder, including Section 301 of the Act. 33 U.S.C. § 1319(b).

36. The Clean Water Act also authorizes the United States to commence a civil action for appropriate relief whenever the EPA finds that a person is in violation of any condition or limitation in a NPDES permit. 33 U.S.C. § 1319(b).

37. The Clean Water Act authorizes civil penalties for each violation of the Act, including any condition or limitation in a NPDES permit. 33 U.S.C. § 1319(d). The maximum penalty is currently $68,445 per day for each violation occurring after November 2, 2015, and assessed after January 8, 2025. *See* 40 C.F.R. § 19.4 (including amendments promulgated at 90 Fed. Reg. 1375 (Jan. 8, 2025)).

38. The Clean Water Act authorizes any citizen to commence a civil action against any person who is alleged to have violated or to be in violation of an effluent standard or limitation under the Act or an order issued by the EPA with respect to such a standard or limitation. 33 U.S.C. § 1365(a)(1).

39. If the EPA has commenced and is diligently prosecuting a civil action in federal court to require compliance with a standard, limitation, or order that citizens could otherwise commence a citizen suit to enforce, the Clean Water Act provides that "any citizen may intervene [in any such action] as a matter of right." 33 U.S.C. § 1365(b)(1)(B).

## FACTUAL ALLEGATIONS

### DC Water is Responsible for the Operation and Maintenance of the PI

40. The PI was designed and built in the 1960s, is approximately 54 miles long, ranges between 30 and 96 inches in diameter, and conveys an average of 60 million gallons of sewage per day to Blue Plains for treatment and disposal.

41. At all relevant times, DC Water was and is responsible for maintaining, operating, inspecting, and repairing the PI along its entire length, including segments in Fairfax County, Virginia; Loudoun County, Virginia; Montgomery County, Maryland; and the District of Columbia.

42. DC Water holds NPDES Permit No. DC0021199 ("NPDES Permit"), issued by the EPA pursuant to 33 U.S.C. § 1342, authorizing the discharge of treated wastewater from Blue Plains to the Potomac River subject to certain conditions and effluent limitations. The NPDES Permit was administratively extended by the EPA pursuant to 40 C.F.R. § 122.6(a) and remains in full force and effect.

43. The NPDES Permit requires DC Water to "at all times properly operate, inspect and maintain all facilities and systems of treatment and control (and related appurtenances, including but not limited to, sewers, intercepting chambers, interceptors, combined sewer overflows, pumping stations, and emergency bypasses) which are installed or used by [DC Water] to achieve compliance with the conditions of [the Permit]." NPDES Permit, Part II, Section B.

44. This provision "requires the operation and maintenance of back-up or auxiliary facilities or similar systems when necessary to achieve compliance with the conditions of the permit." NPDES Permit, Part II, Section B.

45. The NPDES Permit specifies that "[p]roper operation and maintenance" includes "effective performance, adequate funding, adequate operator staffing and training, and adequate

laboratory and process controls, including appropriate quality assurance procedures." NPDES Permit, Part II, Section B.

46. The NPDES Permit also requires DC Water to "take all reasonable steps to minimize or correct any adverse impact on the environment resulting from noncompliance with" the NPDES Permit. NPDES Permit, Part II, Section A.4.

47. Discharges that are not authorized by the NPDES Permit are prohibited.

48. In 2012, DC Water, WSSC Water, the District of Columbia, Fairfax County, Virginia, Montgomery County, Maryland, and Prince George's County, Maryland (together, the "IMA Parties") entered into the IMA for the purposes of allocating wastewater treatment capacity and flow at Blue Plains, as well as certain costs of wastewater treatment and biosolids management, among other things.

49. Pursuant to the IMA, DC Water, as NPDES Permit holder, is responsible for operating, maintaining, and managing Blue Plains and the entire collection system, including the PI. IMA § 1, Key Principle 7. The IMA further provides that, while DC Water will afford IMA Parties an opportunity to review and comment on issues relating to the IMA, "DC Water shall continue to exercise its discretion and judgment with regard to the operation, maintenance, and management of Blue Plains and Other Associated Facilities [including the PI]." *Id.*

50. WSSC Water depends on the PI as a major component of wastewater conveyance to serve its customers in Montgomery and Prince George's Counties, Maryland.

**DC Water Had Actual Knowledge of the PI's Deteriorating Condition**

51. The January 19, 2026 collapse occurred between Manholes 16 and 17, a segment DC Water had identified for over a decade as one of the PI's most deteriorated.

52. DC Water inspected the PI between 2011 and 2015 and acknowledged that the results of that inspection indicated that the majority of the pipe showed signs of corrosion.

53. In December 2015, DC Water formally designated capital improvement project LZ to rehabilitate structural defects in various locations of the PI, including between Manholes 15 and 20, a scope that included the segment that ultimately collapsed.

54. In October 2018, DC Water briefed the IMA Technical Subcommittee on the condition of the PI. DC Water identified the segment between Manholes 16 and 17 under CIP project LZ09 as a High Priority rehabilitation segment and represented that it had submitted a categorical exclusion application under NEPA to begin the permitting process for repairs.

55. Upon information and belief, in 2018, DC Water's own engineers submitted a proposal to the National Park Service seeking to repair Segment LZ09 near Clara Barton Parkway, warning that if this section was not addressed it "could result in a catastrophic failure, leading to the release of raw sewage into soil, groundwater, and waterways."

56. Upon information and belief, in December 2024, DC Water acknowledged in materials prepared for a meeting with the National Park Service that the PI "needs immediate repair in which the rapid degradation of the pipe has made it a high priority task to prevent collapse."

57. Upon information and belief, DC Water specifically conducted inspections of the PI between Manholes 16 and 17 on December 11, 2017; July 21, 2021; June 9, 2024; and October 6, 2024.

58. Upon information and belief, during all four inspections, exposed aggregate and surface reinforcement was seen from 150 to 200 feet downstream of Manhole 17, and DC Water observed significant structural defects along the PI within a few hundred feet of the section that collapsed.

**DC Water's Inaction**

59. Following the October 2018 IMA Technical Subcommittee briefing, DC Water issued a cost share document for Project LZ09, designated MJ36, for rehabilitation of the PI from Manhole 20 to Manhole 15. WSSC Water concurred in the MJ36 cost share in January 2019, based on DC Water's representation that construction would be completed by summer 2022.

60. From 2020 through 2026, DC Water billed WSSC Water a total of $781,926.62 under MJ36 for planning and design costs associated with Project LZ09.

61. DC Water presented annual updates to the IMA Parties from 2020 through 2026 reporting on the status of Project LZ09. Each year, DC Water pushed the projected construction start date back. In January 2026, shortly before the collapse, DC Water reported that the construction would begin in January 2027.

62. In February 2025, DC Water issued a Request for Qualifications for a Construction Manager at Risk contract (No. 25-0120) for rehabilitation of the PI between Manholes 20 and 11, which encompassed the segment that ultimately collapsed. On February 14, 2025, DC Water cancelled that procurement, stating only that "cancellation is necessary to best serve the agency's infrastructure needs."

63. In April 2025, DC Water's Board of Directors awarded a $45 million emergency master services agreement to Garney Construction for PI rehabilitation. That contract was subsequently cancelled before any work was performed on the segment that ultimately collapsed.

64. In late 2025, DC Water issued a task order to Fort Myer Construction under an existing master services agreement for rehabilitation of a section of the PI between Manholes 19 and 18, located approximately a quarter mile from the segment that ultimately collapsed. DC Water completed that work in December 2025. DC Water did not include the segment between Manholes 16 and 17 in that project.

65. Upon information and belief, on March 2, 2026, DC Water acknowledged in response to an EPA information request that it did not use traditional methods to inspect the PI and did not use industry-accepted methods to rate its defects.

66. Upon information and belief, several years before the January 19, 2026 collapse, the existing sewer near Manhole 31 on the Virginia side collapsed within an active rehabilitation work zone, triggering a sanitary sewer overflow and requiring DC Water to spend approximately $8.5 million on emergency stabilization work on a pipe segment DC Water planned to permanently abandon within months. DC Water, its design-build contractor, and its construction manager all knew of the pipe's deteriorated condition and controlled the project site at the time of collapse.

67. DC Water knew or should have known that the concrete pipe between Manholes 16 and 17 had corroded and that if not corrected could result in a structural failure, leading to the release of raw sewage into soil, groundwater, and waterways.

68. DC Water did not adequately maintain the PI in good working order as required by its NPDES Permit.

**DC Water's Failure to Implement Interim Safeguards**

69. Despite knowing for over a decade that the PI was deteriorating and at high risk of catastrophic failure, DC Water failed to implement any reasonable interim measures to manage that risk while rehabilitation was pending. Upon information and belief, DC Water failed to: (1) increase inspection frequency or implement real-time structural monitoring for the highest-risk segments adjacent to the Potomac River; (2) implement temporary flow diversion or load reduction protocols to decrease hydraulic stress or external stress from soil loading above the pipe on the most vulnerable segments; (3) pre-position emergency bypass equipment or rehearse emergency response plans calibrated to the foreseeable contingency of a large-diameter pipe failure in the C&O Canal corridor; (4) install temporary liners, external support, or other stopgap structural

measures for the highest-risk section; or (5) pre-position containment booms, deploy automated overflow detection systems, or establish coordination agreements with downstream water utilities and park authorities. Upon information and belief, none of these measures were in place when the PI segment failed.

70. EPA's own guidance for evaluating collection system management identifies the "avoidance of catastrophic system failures such as a collapsed pipe" as a "major performance indicator" of program adequacy, and requires utilities to maintain emergency preparedness plans, bypass equipment, risk-based inspection prioritization, and notification protocols. DC Water implemented none of these measures for the highest-risk segments of the PI.

71. Upon information and belief, DC Water did not conduct a contemporaneous condition assessment of the pipe section between Manholes 16 and 17 while its own engineers were physically present and actively rehabilitating the adjacent upstream segment. Despite DC Water's recognition that the adjacent segments shared the same corrosion characteristics and risks, it continued operating the PI at full capacity through the segment without any additional interim protection.

**The PI's Collapse**

72. On January 19, 2026, a 72-inch diameter section of the PI between Manholes 16 and 17 ruptured and collapsed within the C&O Canal National Historical Park near Lock 12, along the Clara Barton Parkway in Montgomery County, Maryland.

73. The PI's collapse caused sewage to flow into "original Rock Run," a relatively permanent, perennial tributary to the Potomac River, and then into the Potomac River itself. Sewage discharged to the Potomac River continuously from January 19, 2026, through at least January 28, 2026.

74. The Potomac River is a traditionally navigable water.

75. DC Water pumped sewage from the PI upstream of the collapsed section into the C&O Canal, using the canal to route sewage around the collapsed section, and returning it to the PI downstream of the collapsed section.

76. Overflows of sewage into the Potomac River continued even after DC Water deployed this bypass. For example, upon information and belief, discharges into the Potomac River of sewage associated with the section of the PI that collapsed occurred on January 25, January 26, January 27, January 28, February 3, February 6, February 8, and February 10.

77. DC Water's use of the C&O Canal to route sewage around the collapsed section of the PI required multiple high-powered pumps. Upon information and belief, these pumps periodically clogged, requiring them to be taken out of service and cleaned.

78. Despite the importance of these pumps, DC Water did not deploy sufficient pumping capacity until mid-February 2026.

79. Between January 22 and January 24, 2026, DC Water installed the first six diversionary pumps. Upon information and belief, each pump had a nameplate pumping capacity of approximately seven million gallons per day ("MGD").

80. On January 28, 2026, DC Water installed and began operating two additional diversionary pumps, upon information and belief, with daily pumping capacity of approximately seven MGD each. These additional pumps brought the total number of pumps on site to eight and, upon information and belief, increased the total rated pumping capacity to approximately 56 MGD.

81. As a result of insufficient pumps and pumping capacity, there were additional sewage overflows into the Potomac River.

82. These additional overflows may have been avoided had DC Water initially deployed sufficient pumps and pumping capacity.

83. On February 8, 2026, DC Water reported that an estimated 500,000 gallons of sewage, associated with the collapsed section of the PI, was discharged to the Potomac River when multiple clogged pumps had to be shut down.

84. Between January 29 and February 9, 2026, approximately 1.5 million gallons of sewage from the PI was discharged to the Potomac River.

85. On February 14, 2026, DC Water added larger pumps, increasing the total pumping capacity.

86. Following the collapse, DC Water left sludge and sewage on the ground in the vicinity of the collapse, where stormwater could wash it into the Potomac River or its tributaries.

87. DC Water failed to divert such stormwater, allowing it to wash sludge and sewage that remained on the ground into the Potomac River.

88. Upon information and belief, as of March 18, 2026, remnants of untreated sewage from the collapse were along the flow path of the "original Rock Run" tributary to that tributary's confluence with the Potomac River.

89. Upon information and belief, as of April 14, 2026, soil contaminated by sewage from the collapse remained in the vicinity of the Potomac River.

90. Upon information and belief, sewage leaked from the ceiling and side walls of the stone culvert that carries the "original Rock Run" tributary under the C&O Canal and dripped into the tributary beginning in late January 2026.

91. The collapse of this section of the PI has resulted in the discharge of approximately 243 million gallons of raw, untreated sewage to the Potomac River to date.

**Impact of DC Water's Unauthorized Discharge**

92. After the sewage spill, the Potomac River was not safe for human contact or recreation.

93. The sewage discharged from the PI constitutes "pollutants" within the meaning of 33 U.S.C. § 1362(6). The untreated wastewater contained pollutants regulated under the NPDES Permit, including E. coli, ammonia nitrogen, total suspended solids, total phosphorus, total nitrogen, and pH-altering substances.

94. The discharge also contained toxic pollutants designated under Clean Water Act Section 307(a), 33 U.S.C. § 1317(a), and 40 C.F.R. § 401.15, including lead, mercury, cadmium, nickel, and polychlorinated biphenyls (PCBs).

95. In addition, the spill resulted in dangerously high levels of E. coli in waters near the collapse site and at multiple points downstream.

96. In addition to E. coli, antibiotic-resistant bacteria, including methicillin-resistant Staphylococcus aureus (MRSA)—the bacteria responsible for staph infections—were detected in the Potomac River at the spill site and nine miles downstream of the spill.

97. Upon information and belief, two days after the PI's collapse, levels of E. coli in the Potomac River were more than 10,000 times EPA's recommended threshold level for recreational water contact at the location where the sewage flowed into the Potomac River.

98. Upon information and belief, a week after the collapse, levels of E. coli at the location where the sewage entered the Potomac River were more than 2,500 times EPA's recommended threshold level.

99. Upon information and belief, a week after the collapse, E. coli levels in the Potomac River exceeded EPA's recommended threshold level 10 miles downstream from the collapse site.

100. On February 26, 2026, DC Water representatives stated that elevated levels of E. coli were observed at the sampling location where "original Rock Run" meets the Potomac River.

101. Governmental agencies responsible for protecting public health and the environment advised the public not to recreate on the Potomac River or eat fish or wildlife from the Potomac River, and closed shellfish beds.

102. On or about January 24, 2026, the Maryland Department of the Environment issued an emergency closure of the Potomac River in Charles County, Maryland for commercial shellfish harvesting.

103. On or about January 24 or 25, 2026, the Maryland Department of Health, Prince George's County Health Department, and Charles County Department of Health in Maryland issued advisories recommending that the public avoid contact with untreated sewage in certain sections of the Potomac River.

104. The Maryland Department of the Environment also issued precautionary shellfish harvesting closures north of Governor Harry W. Nice Memorial Bridge (Route 301).

105. On January 29, 2026, the Montgomery County Department of Health and Human Services and Department of Environmental Protection issued an advisory to avoid contact with the water or shoreline of impacted areas and to avoid eating fish, shellfish, or any other wildlife from the Potomac River. This advisory was kept in place until March 17, 2026.

106. On February 13, 2026, the Virginia Department of Health issued a Recreational Water Advisory for the Potomac River extending for 72.5 miles from the American Legion Memorial Bridge (I-495) in Fairfax County to the Governor Harry W. Nice Memorial Bridge (Route 301) in King George County.

107. On February 18, 2026, the District of Columbia declared that the sewage spill constituted a public emergency.

108. From February 20, 2026, to March 2, 2026, the District of Columbia Department of Health ("DC Health") maintained a recreational advisory for the portion of the Potomac River located within the District of Columbia.

109. The Virginia Department of Health lifted its recreational water advisory for the portion of the Potomac River from the Route 120 Chain Bridge to the Governor Harry W. Nice Memorial Bridge (Route 301) in King George County on March 17, 2026.

110. The Montgomery County Health Department's January 29, 2026 advisory was fully lifted on July 31, 2026, after sampling determined bacteria detections had returned to acceptable levels.

**WSSC Water's Drinking Water Supply Remains at Risk**

111. On March 2, 2026, DC Water's CEO testified under oath before the DC Council that at least two additional PI segments are in condition equal to or worse than the segment that collapsed.

112. DC Water has identified an approximately 1,750-linear-foot compromised section of the PI near the confluence of Muddy Branch and the Potomac River requiring emergency repairs. This section is located upstream of and in close proximity to WSSC Water's drinking water intake infrastructure. If this section were to collapse, WSSC Water's drinking water supply for more than one million customers would be at immediate risk of contamination with untreated sewage and pollutants.

**Joinder of the District of Columbia**

113. This enforcement action was initially commenced by the United States on April 20, 2026.

114. Section 309(e) of the Clean Water Act, 33 U.S.C. § 1319(e), requires "[w]henever a municipality is a party to a civil action brought by the United States under [section 309 of the Clean Water Act], the State in which such municipality is located shall be joined as a party."

115. DC Water is a "municipality" as defined in 33 U.S.C. § 1362(4).

116. Section 309(e) further provides that such "State shall be liable for payment of any judgment, or any expenses incurred as a result of complying with any judgment . . . to the extent that the laws of that State prevent the municipality from raising revenues needed to comply with such judgment." 33 U.S.C. § 1319(e).

117. Section 502(3) of the Clean Water Act, 33 U.S.C. § 1362(3), defines "State" to include the District of Columbia.

118. Accordingly, under these provisions, the District of Columbia would be liable for the failure of DC Water to comply with a judgment to the extent its laws prevent DC Water, now or in the future, from raising the revenues necessary to comply.

## FIRST CLAIM FOR RELIEF
## (DC Water's Unauthorized Discharges of Sewage)

119. WSSC Water realleges and incorporates by reference Paragraphs 1 through 118 as if fully set forth herein.

120. From January 19, 2026, through at least February 15, 2026, DC Water discharged sewage from the PI to navigable waters.

121. Sewage is a pollutant within the meaning of 33 U.S.C. § 1362(6).

122. The PI is a "point source" within the meaning of 33 U.S.C. § 1362(14).

123. "Original Rock Run" and the Potomac River are navigable waters within the meaning of 33 U.S.C. § 1362(7).

124. The discharges from the PI to navigable waters were not authorized by any permit issued under the Clean Water Act.

125. Each of these discharges was a violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

126. Unless enjoined, DC Water's violations are likely to continue.

127. As a result of these violations, DC Water is liable for injunctive relief pursuant to section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b).

**SECOND CLAIM FOR RELIEF**
**(NPDES Permit Violations – Failure to Properly Operate, Inspect, and Maintain)**

128. WSSC Water realleges and incorporates by reference Paragraphs 1 through 127 as if fully set forth herein.

129. The Permit requires that:

> The permittee shall at all times properly operate, inspect and maintain all facilities and systems of treatment and control (and related appurtenances, including but not limited to, sewers, intercepting chambers, interceptors, combined sewer overflows, pumping stations, and emergency bypasses) which are installed or used by the permittee to achieve compliance with the conditions of this permit.

Permit, Part II, Section B.

130. DC Water has failed to properly operate, inspect, and maintain the PI, in violation of the Permit and the Clean Water Act.

131. Upon information and belief, DC Water has failed to properly operate, inspect, and maintain other parts of its sanitary sewer system with conditions similar to those leading up to the collapse of the PI, in violation of the Permit and the Clean Water Act.

132. Each day DC Water has failed to properly operate, inspect, and maintain its sanitary sewer system constitutes a separate violation of the Permit and Clean Water Act.

133. Unless enjoined, DC Water's violations are likely to continue.

134. As a result of these violations, DC Water is liable for injunctive relief pursuant to section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b).

**THIRD CLAIM FOR RELIEF**
**(NPDES Permit Violations – Failure to Minimize Adverse Impact)**

135. WSSC Water realleges and incorporates by reference Paragraphs 1 through 134 as if fully set forth herein.

136. The NPDES Permit requires DC Water "to take all reasonable steps to minimize or correct any adverse impact on the environment resulting from noncompliance with" the NPDES Permit. NPDES Permit, Part II, Section A.4.

137. DC Water failed to take all reasonable steps to minimize or correct any adverse impact on the environment resulting from its noncompliance with the NPDES Permit, in violation of the NPDES Permit and the Clean Water Act.

138. For example, DC Water failed to promptly contain the overflow, allowing continued discharges to reach the Potomac River.

139. DC Water also failed to promptly remove sludge and sewage on the ground or otherwise remediate it, including by stormwater diversion, to prevent it from being washed into the Potomac River by stormwater or other runoff.

140. DC Water further allowed sewage to leak from the stone culvert that carries "original Rock Run" under the C&O Canal.

141. DC Water failed to remediate areas polluted by the sewage spill, including areas downstream of where DC Water conducted clean-up efforts.

142. DC Water also failed to take reasonable steps to protect WSSC Water's drinking water intake infrastructure, located in close proximity to a compromised PI segment near the confluence of Muddy Branch and the Potomac River, from the ongoing risk of an additional

collapse and unauthorized discharge that would contaminate WSSC Water's primary drinking water source serving more than one million customers.

143. Unless enjoined, DC Water's violations are likely to continue.

144. As a result of these violations, DC Water is liable for injunctive relief pursuant to section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b).

## PRAYER OF RELIEF

WHEREFORE, WSSC Water requests that the Court:

A. Declare DC Water to have violated and to be in violation of Clean Water Act section 301(a) and its NPDES Permit;

B. Permanently enjoin DC Water from discharging pollutants to waters of the United States except in compliance with the Clean Water Act and from operating the PI inconsistently with section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and its NPDES Permit;

C. Order DC Water to take appropriate steps to prevent future violations of section 301(a) of the Clean Water Act and its NPDES Permit, including by appropriately addressing corroded portions of the PI;

D. Order DC Water to remedy its violations in association with the collapse of a section of the PI by, among other things, ordering it to take all reasonable steps to redress or mitigate the impact of its violations and to comply with the requirements of its NPDES Permit;

E. Order DC Water to assess, repair, and rehabilitate all PI segments in condition equal to or worse than the segment that collapsed, including the segment near the confluence of Muddy Branch and the Potomac River located in close proximity to WSSC Water's drinking water intake infrastructure serving more than one million customers daily, and

to take all measures to prevent future unauthorized discharges that would threaten WSSC Water's operations and its customers' drinking water supply;

F. Order DC Water to pay reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d); and

G. Grant such other relief as the Court deems just and proper.

Respectfully submitted, this 18th day of August 2026.

**TROUTMAN PEPPER LOCKE LLP**

/s/ *Toyja E. Kelley*

Toyja E. Kelley, Sr. (DC Bar No. 482977)
Troutman Pepper Locke LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
Telephone: 202-220-6900
Facsimile: 202-220-6945
toyja.kelley@troutman.com

Lindsey B. Mann (*pro hac vice application forthcoming*)
lindsey.mann@troutman.com
E. Fitzgerald Veira (*pro hac vice application forthcoming*)
fitzgerald.veira@troutman.com
Jack M. Ryan (*pro hac vice application forthcoming*)
jack.ryan@troutman.com
Troutman Pepper Locke LLP
600 Peachtree Street, N.E., Suite 3000
Bank of America Plaza
Atlanta, Georgia 30308-2216
(404) 885-3000 (phone)

*Counsel for Proposed Plaintiff-Intervenor WSSC Water*